IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOSHUA FRANK HAMBLY, | ) | Case No. 1:23-cv-501 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, Joshua Frank Hambly, seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards in explaining how she evaluated and incorporated the opinion of Dr. Delcour, I recommend that the Commissioner's final decision denying Hambly's applications for DIB and SSI be vacated and that Hambly's case be remanded for further consideration.

## II.    Procedural History

On December 29, 2020, Hambly filed an application for DIB and SSI.  (Tr. 22, 63, 71, 79).  Hambly alleged a disability onset date of February 25, 2019, (Tr. 22, 81, 89, 202), and asserted that he was disabled due to attention deficit/hyperactivity disorder ("ADHD") and intermittent explosive disorder ("IED"), (Tr. 81, 89, 239).  His application was denied at the

initial level, (Tr. 63-78), and then upon reconsideration, (Tr. 81-96).  He then requested a

hearing.  (Tr. 124).  Prior to the ALJ hearing, Hambly submitted a brief asserting that: (i) there

were nine physical and six mental impairments noted in the record; and (ii) Hambly suffered

from five severe impairments (ADHD, unspecified arthropathies, obesity, learning disorder, and

migraines).  (Tr. 284-286).

Administrative Law Judge ("ALJ") Pamela Loesel heard the matter on March 23, 2022

and denied the claims in an April 26, 2022 decision.  (Tr. 18-35).  In so ruling, the ALJ

determined that Hambly had the residual functional capacity ("RFC") to perform work at the

light exertional level, except that:

> [Hambly could] [o]ccasionally lift and carry 20 pounds and frequently lift and carry
> 10 pounds; can stand and walk 6 hours of an 8-hour workday; can sit for 6 hours of
> an 8-hour workday; unlimited push and pull other than shown for lift and/or carry;
> can perform simple routine tasks (unskilled work) with no fast pace or high
> production quotas; with occasional interaction with others; and occasional
> superficial interaction (meaning of a short duration for a specific purpose) with the
> general public; can perform work with occasional change; can perform low stress
> work meaning no arbitration, negotiation, confrontation, responsibility for the
> safety of others or supervisory responsibility.

On January 13, 2023, the Appeals Council denied Hambly's request for review, making

the ALJ's decision the final decision of the Commissioner.  (Tr. 7-11).  On March 13, 2023,

Hambly filed a complaint to obtain judicial review.  ECF Doc. 1.

### III.  Evidence

#### A.  Personal and Vocational Evidence

Hambly was born on March 14, 1992 and was 26 years and 11 months old on the alleged

onset date.  (*See* Tr. 63, 71, 195, 202).  Hambly had past work as a janitor and general laborer at

a factory.  (Tr. 69, 240).

### B.    Educational Records and Evidence

Hambly graduated from high school in 2011 despite a learning disability in reading. (Tr. 26, 240).  On January 26, 2011, a school psychologist at Mansfield City Schools, Jen Ballinger, Psy.S., NCSP, completed an evaluation team report ("ETR") for Hambly.  (Tr. 319-336).  The ETR indicated that Dr. J.R. Clark had conducted a physiological evaluation in December 2010 and diagnosed Hambly with "Mood Disorder-NOS, Attention Deficit Hyperactivity Disorder, and a Learning Disorder."  (Tr. 319).  The ETR summarized several assessments of Hambly's general intelligence and stated that his full-scale IQ ranged from 75-85, which was within the "Low Average to Borderline ranges."  (Tr. 321).  A summary of his academic skills, which was based on recent testing, demonstrated that Hambly's skills: (i) were average in the areas of basic reading, reading comprehension, pseudoword decoding, essay composition and spelling; and (ii) below average in the areas of sentence completion, math problem-solving, and numerical operations.  (Tr. 322).  The ETR further indicated that Hambly: (i) struggled in large group settings; (ii) needed to improve personal social behaviors and living habits; and (iii) exhibited some maladaptive behaviors while at school.  (Tr. 325-328).  After reviewing the overall record, including relevant observations, reports, and testing, Dr. Ballinger stated that Hambly had specific learning disabilities in certain areas, but he did not meet the criteria for having a disability, nor did his diagnosis for ADHD "appear to currently result in significant limitations in strength, vitality, or alertness, including a heightened alertness to environmental stimuli."  (Tr. 335).

After an annual review in early 2011, Mansfield City Schools created an Individualized Education Program ("IEP") for Hambly going into his 12th grade year.  (Tr. 300-314).  The IEP indicated that Hambly did not have behavior which impeded his learning or the learning of others or which limited his English proficiency.  (Tr. 301).  It stated that Hambly scored in the

borderline to low average range in math computation; his decoding skills were in the average range; his reading comprehension skills were in the extremely low range; and his vocabulary knowledge was in the low average range. (Tr. 301). The IEP stated that Hambly needed to improve personal social behaviors and daily living habits that had been identified by employers for entry-level workers that are essential for obtaining employment and for success in the workplace, but it also noted that Hambly scored average on self-help skills in the areas of "travels independently" and "communicates effectively," while his work habits scored average. (Tr. 302).

### C.    Medical Evidence

On January 17, 2019, Hambly visited the Avita Ontario Emergency Department, complaining of a headache with 5/10 pain and reporting a history of migraines. (Tr. 359). Jessica Hannan, APRN-CNP, noted that Hambly described the pain as currently mild and diagnosed him with an "Acute nonintractable headache, unspecific headache type." (Tr. 398).

On November 30, 2019, Hambly visited the Mansfield Hospital Emergency Department, complaining of intermittent, sharp, non-radiating chest pain that had been occurring for about a week. (Tr. 347, 351-352). Hambly's physical examination and laboratory tests were unremarkable and normal, with his mood, behavior, thought content, and judgment all considered normal, and his mental status described as: "alert and oriented to person, place, and time. Mental status is at baseline." (Tr. 349-350). Carol Marlon, M.D., discharged Hambly after diagnosing him with acute costochondritis (inflammation of the cartilage that connects the ribs to the sternum). (Tr. 351).

On March 6, 2020, Hambly had an office visit with Amber Campbell, APRN-CNP, for a migraine, telling her that he: (i) had a history of migraines; (ii) experienced one to two migraines a month; and (iii) took medication that would abort the migraine, but he needed a refill. (Tr. 391). Hambly's review of systems demonstrated that he was positive for headaches and his

4

physical examination showed that he was obese, but they were both otherwise unremarkable. (Tr. 391-392).  CNP Campbell diagnosed Hambly with a nonintractable migraine and prescribed Hambly medication.  (Tr. 394).

On May 23, 2020, Hambly visited the Mansfield Hospital Emergency Department for a hand injury to his right hand that was caused by his having "struck a trailer multiple times." (Tr. 361).  Hambly's review of systems and physical examination were unremarkable, save for the injury to his right hand.  (Tr. 363-364).  His right hand exhibited decreased range of motion in the 4th and 5th digits, tenderness, and swelling, but there was normal sensation, normal strength, and no deformity or laceration.  (Tr. 364).  The treating physician noted that Hambly was negative for behavioral problems and "suicidal ideas," and he displayed normal mood and behavior.  (Tr. 363-364).

On June 22, 2020, Hambly had a follow-up appointment with CNP Campbell regarding his right-hand injury and for a refill of his migraine medication.  (Tr. 387).  Hambly's review of systems was positive for agitation and his physical examination was positive for bony tenderness of his right hand – with normal range of motion, sensation, and strength.  (Tr. 389).  CNP Campbell prescribed a refill of migraine medication, referred Hambly to orthopedics for his hand injury, and referred him to Catalyst Life Services for his irritability and anger.  (Tr. 390).

On June 30, 2020, Hambly presented to the Catalyst Life Services walk-in clinic via telephone – due to the COVIC-19 pandemic – for the purpose of addressing his anger issues and requested a referral to anger management.  (Tr. 339, 343).  Hambly reported feeling alone and withdrawn and stated that yelling, fighting, and screaming triggered his anger, but he also noted that he did not "get angry often cause he can control it."  (Tr. 342).  The clinician who interviewed Hambly, Jessica Green, LSW, diagnosed him with an adjustment disorder, with mixed anxiety and depressed mood.  (Tr. 343-344).

5

On July 10, 2020, Hambly visited the Mansfield Hospital Emergency Department, complaining of nausea and feeling lightheaded after bending down to pick up something. (Tr. 370, 374).  Hambly's review of systems was positive for nausea and light-headedness and his physical and neurological examinations were unremarkable.  (Tr. 372-373).  Anand Patel, M.D., noted that Hambly had had minimal fluid intake for the day and his lab work was unremarkable, and ultimately diagnosed him with postural dizziness with presyncope.  (Tr. 374-375).

On September 9, 2020, Hambly had an appointment with CNP Campbell during which he complained of abdominal pain, nausea, and vomiting that had worsened over the last 30 days, as well as foot pain that began 12 months prior and was worsening.  (Tr. 383).  Hambly's review of systems was positive for abdominal pain and nausea, arthralgias (joint pain), and numbness, and his physical examination revealed that he was obese and specific portions of his feet were tender with decreased sensation.  (Tr. 384-385).  CNP Campbell prescribed Hambly a proton pump inhibitor to treat his gastroesophageal reflux disease (chronic acid reflux) and referred him to a podiatrist for the foot pain.  (Tr. 386).

On April 7, 2021, Hambly had an acute visit with Tricia Giddens, CNP, regarding his IED and his desire to take Lexapro – a medication he had taken in the past for his IED and which he indicated had previously helped his mood.  (Tr. 485-487).  Hambly's review of systems was positive for behavioral problems but was otherwise negative for agitation, dysphoric mood, hallucinations, self-injury, sleep disturbance, and suicidal ideas.  (Tr. 486).  CNP Giddens assessed Hambly with IED and mood disorder and prescribed Lexapro and counseling. (Tr. 487).

On May 20, 2021, Hambly had a follow-up appointment with CNP Giddens.  (Tr. 492). He stated that he was currently seeing a behavioral health therapist and reported that he was

experiencing improvement in his anger and mood while on Lexapro.  (Tr. 492).  Hambly's review of systems was positive for behavioral problems (but otherwise unremarkable) and his neurological and physical examinations were unremarkable – with Hambly being alert and displaying normal mood, speech, behavior, and judgment.  (Tr. 493-494).  CNP Giddens noted that Hambly's anger had improved significantly, his mood was stable, and he was doing well under Lexapro.  (Tr. 494).

On May 24, 2021, Hambly had an office visit with Amanda Lilly, CNP, for mid to lower back pain.  (Tr. 496).  Hambly denied any injury or trauma.  (Tr. 497).  CNP Lilly diagnosed acute left-sided back pain, prescribed pain medication, and gave Hambly strengthening exercise handouts and information concerning proper lifting and body mechanics. (Tr. 497).

On June 4, 2021, Hambly had a follow-up appointment and annual exam with CNP Giddens.  (Tr. 510).  He presented with chronic, aching, non-radiating back pain that he described as waxing and waning since its onset a year prior.  (Tr. 510).  Hambly's review of systems was positive for back pain and his physical examination revealed tenderness in the lumbar region as well as decreased range of motion.  (Tr. 511).  CNP Giddens diagnosed chronic bilateral low back pain without sciatica and prescribed topical medication.  (Tr. 514-516).

On October 2, 2021, Hambly had an appointment with CNP Giddens for a Lexapro refill and for his right hip and leg pain, with Hambly reporting that the pain in his leg was: (i) accompanied by spontaneous numbness/tingling and uncontrolled movement; and (ii) worse when lying down but did not worsen with movement or weight bearing.  (Tr. 538).  With regards to his IED and mood disorder, Hambly reported that his mood was good and stable, he had not seen his counselor for some time and needed to make an appointment, and he was happy with his current treatment plan.  (Tr. 538).  His review of systems was positive for joint pain and numbness, and his physical examination was unremarkable.  (Tr. 540).

On November 4, 2021, Hambly had an appointment with Ashley Wilfrod, CNP, complaining of back pain. (Tr. 533-534). Hambly's review of systems was positive for joint, back, and shoulder pain, and his physical examination revealed general musculoskeletal tenderness, limited range of motion in his shoulders, and back pain with certain movements, as well as a supple neck. (Tr. 536). CNP Wilford referred Hambly to a sports medicine specialist. (Tr. 535).

On November 22, 2021, Hambly saw Michael Viau, M.D., at OhioHealth Orthopedic and Sports Medicine for his lower back and right hip pain. (Tr. 543). Dr. Viau noted that X-ray imaging showed normal hips and a mild degenerative disc disease, but the results were otherwise unremarkable. (Tr. 544). His assessment was that the pain was likely from a secondary degenerative disc and there appeared to be no clear evidence of hip disease. (Tr. 544). Dr. Viau placed Hambly on meloxicam and stated he would arrange physical therapy or an MRI if there was no improvement. (Tr. 544).

From December 2, 2021, to January 4, 2022, Hambly attended nine physical therapy sessions for sprain and strain of his lumbosacral joint/ligament. (Tr. 551-596). At the first session on December 2, 2021, Hambly reported that the average pain was a 6/10 and was a 9/10 at its highest, with the pain better in the morning but worse at the end of the day. (Tr. 592). At the ninth session on January 4, 2022, Hambly reported that he no longer had chronic pain, he had improved overall function, and his pain was a 2/10. (Tr. 552). He stated that he was no longer lifting weights at home and he was being cautious so as to not provoke his symptoms. (Tr. 552). The treatment notes indicated that Hambly had met his goal of decreasing his pain from a 5/10 to a 3/10 or less with full activity at home and work. (Tr. 553).

### D.    Opinion Evidence

#### 1.    Evelyn Rivera, Ph.D.

On April 14, 2021, Evelyn Rivera, Ph.D., conducted a psychological evaluation of Hambly after a referral from the Ohio Division of Disability Determination.  (Tr. 457-461).  Dr. Rivera observed that Hambly: (i) was appropriately groomed; (ii) had speech and thought that were logical and coherent; (iii) denied having suicidal ideation/intent and hallucinations; (iv) displayed euthymic mood and normal energy levels; (v) displayed no anxiety symptoms; (vi) was alert to person, time, and place, but appeared to function at a below average intellectual level; and (vii) reported that he would snap at people at work and get verbally aggressive when angered.  (Tr. 458-459).  Dr. Rivera specifically found that Hambly's learning difficulties, slow verbal processing speed, and his attention difficulties *could* affect his ability to respond appropriately to supervision, co-workers, and work pressures in a work setting.  (Tr. 460-461).

#### 2.    Heather Johnson, LISW

On May 13, 2021, Hambly saw social worker Heather Johnson, LISW, for a behavioral assessment.  (Tr. 488-491).  At the end of the session, Ms. Johnson stated that another 45 minutes would be needed to complete the assessment.  (Tr. 491).  On May 27, 2021, after a second session with Hambly, Ms. Johnson issued a biopsychosocial assessment.  (Tr. 488-491, 501-508).  Ms. Johnson remarked that Hambly had been referred by his primary care physician for aggressive behavior, agitation, behavior problems, irritability, and learning difficulty. (Tr. 501).  She noted that his presentation was unkempt, he had dirty hands and clothing, his grooming was poor, and he had body odor.  (Tr. 501).  She also noted that Hambly had begun taking Lexapro in the past month and it was helping with his anger, anxiety, and moods. (Tr. 501, 508).

9

On July 26, 2021, Ms. Johnson completed a "Residual Functional Capacity Questionnaire – Mental." (Tr. 528-529). Ms. Johnson noted Hambly's diagnoses for IED and adult ADHD and explained that the severity of his mental impairments was demonstrated by his "problems [controlling] emotions and behaviors, anger outburst, and adult ADHD." (Tr. 528). On the checklist provided in the questionnaire, Ms. Johnson indicated that Hambly had: (i) moderate impairments in the areas of "understanding, remembering, or applying information" and "adapting or managing oneself"; and (ii) marked impairments in the areas of "interacting with others" and "maintaining concentration, persistence, or pace." (Tr. 528). She marked a box indicating that Hambly's impairments would cause him to be absent from work three days a month. (Tr. 528). Ms. Johnson further indicated that Hambly had: (i) mild limitations in his ability to remember locations and work-like procedures and to carry out very short and simple instructions; and (ii) moderate limitations in his ability to complete an 8-hour workday and workweek without interruptions from his mental impairments, to get along with coworkers or peers, and to respond appropriately to changes in the work setting. (Tr. 529).

### 3.    James Gatton, M.D.

On April 18, 2021, James Gatton, M.D., conducted a consultive disability evaluation, noting that Hambly had applied for disability on the basis of his progressively worsening ADHD. (Tr. 468). The review of systems was unremarkable. (Tr. 468). Hambly displayed: (i) no complaints of headaches; (ii) no joint or muscle pain or swelling; (iii) no neck or back pain; and (iv) no complaints of weakness, numbness, or incoordination. (Tr. 468). His physical examination was unremarkable, and he displayed no evidence of physical limitations. (Tr. 468-469). Hambly's neurological examination demonstrated no issues with mental status/higher cortical functioning, motor or sensory functioning, or range of motion. (Tr. 469). Dr. Gatton opined:

This is a 29-year-old claimant with AD/HD. This claimant should be able to walk for five to six hours out of an eight-hour day. The claimant could probably be on his feet for a combined five to six hours out of an eight-hour day. The claimant probably could carry less than 10 pounds frequently and more than 40 pounds on occasion.

(Tr. 469).

### 4. State Agency Medical Consultants

State agency medical consultant Steve McKee, M.D., reviewed Hambly's medical record and found that: (i) Hambly was not severely limited by any physical impairments; and (ii) there was no physical residual functional capacity ("PRFC") associated with his claim. (Tr. 73, 75). At the reconsideration level, Dimitri Teague, M.D., reviewed and affirmed Dr. McKee's medical findings, adding that: "The current documentation continues to support the conclusion that [Hambly] does not have a severe physical MDI. While [Hambly] does report he has back pain, he also reports that it waxes and wanes. At 04/21 CE, physical findings were not compromised." (Tr. 83, 85).

### 5. State Agency Psychological Consultants

State agency reviewing psychological consultant Courtney Zuene, Psy.D., completed a Psychiatric Review Technique ("PRT"), (Tr. 65-67), and an assessment of Hambly's Mental Residual Functional Capacity ("MRFC"), (Tr. 67-69). Dr. Zuene opined that Hambly had certain moderate limitations in his ability to: (i) understand, remember, or apply information; (ii) interact with others; (iii) concentrate, persist, or maintain pace; and (iv) adapt or manage himself. (Tr. 66, 68-69). For the MRFC, Dr. Zuene found that Hambly was limited to: (i) simple routine tasks ("SRTs") that did not require extended periods of attention and concentration; (ii) occasional interaction with others; and (iii) static work settings. (Tr. 68-69).

At reconsideration, Karla Delcour, Ph.D., reviewed and affirmed Dr. Zuene's findings as to the PRT. (Tr. 73-75). Dr. Delcour also generally agreed with Dr. Zuene's finding as to the

MRFC, except that Dr. Delcour additionally found that Hambly was moderately limited in his ability to: (i) accept instructions and respond appropriately to criticism from supervisors; and (ii) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  (Tr. 86).  For the MRFC, Dr. Delcour generally agreed with Dr. Zuene but provided the following limitations:

> [1.] Limited to SRTs (1-3 step).
>
> * * *
>
> [2.] Limited to SRTs that do not require extended periods of attention and concentration.  He should avoid settings that require a constant fast pace or extremely close attention to detail.  He is capable of working at an average pace.
>
> * * *
>
> [3.] Limited to occasional interactions with the general public that are superficial in nature.  Should avoid settings where close over the shoulder supervision is required as he reports he doesn't put up with others attitudes very well and is likely to perceive supervisors to have an "attitude" at times. Is capable of an average level of supervision.
>
> * * *
>
> [4.] Limited to static work settings where changes occur on no more than an occasional basis.

(Tr. 86-87).  Notably, Dr. Delcour found that Hambly was moderately limited, and would have some degree of difficulty, in the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  (Tr. 86-87).

### E.  Testimonial Evidence

#### 1.  Claimant Joshua Hambly

At the hearing before the ALJ, Hambly testified that he: (i) keeps his residence clean; (ii) does his own laundry; (iii) can drive; and (iv) can do his own grocery shopping, so long as he makes a list beforehand.  (Tr. 44-45).  He testified that he has worked many different jobs because he had trouble grasping and understanding work requirements and he would have

trouble getting along with coworkers or supervisors.  (Tr. 47-48).  Concerning his medical

impairments, he testified that he: (i) was not currently taking medication for ADHD; (ii) still had

trouble concentrating and staying on task; (iii) was taking Lexapro for his mood swings but it

wasn't helping; (iv) has had trouble with anger control in the past and tries to keep it under

control in public; and (v) suffers from IED.  (Tr. 48-49).

Regarding physical impairments, Hambly testified that he had issues with hip and back

pain which made walking difficult, and that he could stand for 5 minutes, walk for 25-30 yards

before he had to sit down, and lift up to 20 pounds without straining.  (Tr. 50-51).

## 2.    Vocational Expert

John Pullman, a Vocational Expert ("VE"), also testified.  (Tr. 54-61).  After reviewing

Hambly's work history and listening to his testimony, the VE classified Hambly's past work as:

(i) welding machine tender, "SVP of 2, medium physical demand as generally performed in the

DOT, light as described by [Hambly]"; and (ii) production machine tender, "SVP of 3, medium

physical demand as generally performed in the DOT, and light as described by [Hambly]."

(Tr. 55).  The ALJ posed a first hypothetical, asking the VE whether a hypothetical individual

with Hambly's age, experience, and education, could perform any of Hambly's past work with

the following added limitations:

> can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds.
> Can stand and walk for six hours of an eight-hour workday and can sit for six hours
> of an eight-hour workday.  Would have unlimited push and pull other than shown
> for lift and/or carry. . . . can perform simple, routine tasks consistent with unskilled
> work with no fast pace or high production quotas, and with occasional interaction
> with others and occasional superficial interaction with the general public, and by
> superficial, I mean of a short duration for a specific purpose. . . . can perform work
> with occasional change and finally can perform low stress work, meaning no
> arbitration, negotiation, confrontation, responsibility for the safety of others, and/or
> supervisory responsibility.

(Tr. 56-57).  The VE testified that: (i) the production machine tender position would be fully

excluded; (ii) the welding machine tender position would be excluded as generally performed;

and (iii) the hypothetical person could perform the welding machine tender position as actually performed.  (Tr. 57).

The ALJ then asked the VE if there were other jobs the hypothetical person could perform.  (Tr. 57).  The VE testified that the hypothetical person could perform work as a cleaner housekeeper, marker, and cafeteria attendant – with all jobs with an SVP of 2 and a light exertional level.  (Tr. 57-58).  When limitations for being off task 20% of the workday or being absent three time a month were included, the VE testified no work would be available.  (Tr. 58, 59).  Upon cross-examination, the VE was asked whether an individual who did not meet basic standards of cleanliness and neatness, who missed work, or who had trouble accepting supervisor directions would face disciplinary action.  (Tr. 60-61).  The VE responded that, in his experience, such an individual would face disciplinary action and would likely be terminated, depending on the severity and frequency of such behavior.  (Tr. 60-61).

## IV.    The ALJ's Decision

At Step Two, the ALJ determined that Hambly had the following severe impairments: "degenerative disc disease (mild, lumbar), migraine headache disorder, obesity, adjustment disorder with mixed anxiety and depressed mood, intermittent explosive disorder, attention deficit hyperactivity disorder (ADHD), and learning disorder (20 CFR 404.1520(c) and 416.920(c))."  (Tr. 25).  At Step Three, the ALJ determined that none of the severe impairments met or medically equaled the criteria of any listed impairment described in Appendix 1 of the Regulations (20 CFR, Subpart P, Appendix 1).  (Tr. 25-27).  In relevant part, the ALJ considered Hambly's school records, noting:

> In understanding, remembering or applying information, the claimant has a moderate limitation.  The claimant has a history of special education for specific learning disorder in reading, writing, and mathematics.  ([Tr. 333]).  His full-scale IQ score of 81 on the Wechsler Intelligence Scale for Children (WISC-III) was consistent with low-average cognitive functioning.  ([Tr. 321]).  The claimant was able to graduate from high school despite having received special services.

* * *
>  The school records demonstrate a history of ADHD dating to childhood, for which
>  he received small-group instruction and extra time to complete assignments while
>  in high school.  ([Tr. 297-336]).

(Tr. 26).  And the ALJ made the disputed RFC finding set forth at page 2, above.

### A.    Analysis of Hambly's Subjective Symptom Complaints and Medical Evidence

At Step Four, the ALJ reviewed Hambly's statements concerning the intensity,

persistence, and limiting effects of the symptoms from his physical and mental impairments, and

she determined that they were inconsistent with the medical evidence and other evidence in the

record.  (Tr. 27-28).  In determining that the record evidence was not fully consistent with

Hambly's allegations of physical disability, the ALJ stated:

>  The objective evidence and treatment history are not fully consistent with the
>  claimant's allegations of disabling pain. He has a history of conservative treatment
>  for migraine headaches, with his primary care provider prescribing Imitrex.  On
>  January 17, 2019, the claimant presented at the emergency department for a
>  migraine, but he only took aspirin prior to presenting.  He indicated that his pain
>  severity was only "2" on a scale of 0 to 10, but he needed a work note.  [(Tr. 398)].
>  He presented at the emergency room for a migraine headache on June 22, 2020,
>  reporting that these events occur only once or twice per month and Imitrex
>  successfully aborts the symptoms. [(Tr. 387)]. The claimant sought no specialized
>  treatment for these symptoms, including seeing a neurologist or headache clinic.
>  While these symptoms would reasonably limit his ability to perform strenuous or
>  stressful work activity, the evidence fails to demonstrate the symptoms occur at a
>  frequency or intensity that would interfere with work on a
>  regular basis.
>
>  The evidence is also inconsistent with allegations of back pain that would limit his
>  ability to stand and walk for prolonged periods. In fact, the claimant stated in
>  October 2021 that radiating pain was worse with lying down, but not worsened with
>  movement or weight wearing.  [(Tr. 540)].  X-ray imaging revealed only mild
>  degenerative disc changes of the lumbar spine.  [(Tr. 544)].  Physical examinations
>  consistently demonstrated normal strength, sensation, gait, and reflexes, with
>  negative straight leg raising.   [(Tr. 540)].   The claimant was referred for
>  conservative management, including use of NSAIDs and physical therapy.
>  Progress notes demonstrated significant benefits from a conservative course of
>  physical therapy interventions in December 2021 and January 2022.  By the ninth
>  visit on January 24, 2022, he reported only "2" out of "10" pain levels, and noted
>  he no longer had chronic pain.  He indicated that he was no longer lifting heavy

15

weights and being cautious but did not report any pain with his normal daily activities.  [(Tr. 552)].  There was no evidence of pain management services, injections, or surgical intervention.  Progress notes demonstrated multiple recommendations for weight loss and regular exercise, but there was no indication that obesity was exacerbating pain to the extent that he was experiencing mobility limitations.  While the undersigned has considered these symptoms in finding the claimant is limited to a range of light exertional activity, the weight of the evidence is inconsistent with the current allegations of inability to stand or walk more than a few minutes at a time.

(Tr. 28).

The ALJ likewise determined that the record evidence was inconsistent with Hambly's

allegations of disabling metal health limitations, finding that:

The objective evidence and treatment history are also inconsistent with allegations of disabling mental symptoms.  The claimant has received routine, conservative treatment for mental health concerns during the period. Prior to April 2021 when he received Lexapro from his primary care provider, the claimant received essentially no treatment for his intermittent explosive disorder or mood symptoms. A year earlier, the claimant presented for a diagnostic assessment with a mental health provider, Catalyst Life services, but he did not continue with that treatment. [(Tr. 339)].  taking Lexapro, the claimant has consistently reported that he is able to control his anger outbursts, and there is no evidence of symptom exacerbations requiring adjustments of psychotropic medication or dosage. He has not sought any specific treatment for attention deficit symptoms.  He has not experienced increases in anger, depression, anxiety, or other mood difficulties requiring emergency room visits, with the exception of presenting for a hand injury in May 2020 in which he struck a trailer in anger, but this was prior to establishing on [sic] medication. [(Tr. 361)].

The claimant admitted that he manages his daily activities independently.  Although his earnings record demonstrated minimal work activity since onset, he admitted during the consultative examination that he performed "odd jobs" for a family member.  [(Tr. 457-461)].

Mental status examinations consistently were unremarkable during the period, with normal mood, affect, and ability to communicate with various medical providers. There was no indication of behavioral abnormalities or excessive distractibility. While the claimant's mental symptoms and history of learning disorder would reasonably preclude complex, fast-paced tasks or intensive interactions with others, the evidence fails to demonstrate greater limitations.

(Tr. 28-29).

16

### B.      Analysis of Expert Opinions

The ALJ found Dr. Rivera's opinion to be "generally persuasive," noting that the consultative examiner found that the claimant would have some difficulties in work-related areas of completing tasks, relating to others, and managing work stress, but did not seem to suggest that basic work-related activity was precluded in any of these areas.  (Tr. 29).  The ALJ also noted that Hambly "had only recently begun taking medication for mood symptoms prior to this exam, about a week earlier, and subsequent progress notes indicated that his anger outbursts and mood responded significantly to Lexapro."  (Tr. 29).

The ALJ found that Ms. Johnson's opinion was "not fully persuasive" because it was not fully supported or consistent with the evidence.  (Tr. 29-30).  Addressing Ms. Johnson's opinion that Hambly had "marked" limitations in interacting with others and concentration, persistence, and pace, and would miss three workdays per month, the ALJ noted that: (i) this opinion was poorly supported, without references to support the marked nature of his functioning in these areas; (ii) there was no evidence of ongoing treatment with Ms. Johnson's provider; (iii) the record showed that Ms. Johnson had only seen the claimant for two sessions in May 2021 and did not indicate that she saw him again before writing her opinion; and (iv) progress notes indicated that Hambly's symptoms had responded to Lexapro.  (Tr. 29-30).

The ALJ found that Dr. Gatton's opinion – that Hambly could "stand or walk up to 6 hours per eight-hour workday, could carry less than 10 pounds frequently, and could carry more than 40 pounds occasionally – was generally persuasive because it gave significant consideration to the claimant's subjective allegations, as the examination was essentially unremarkable." (Tr. 30).  Considering the evidence as a whole and noting Hambly's subsequent physical therapy, the ALJ noted that he found Dr. Gatton's opinion persuasive to the extent it was consistent with the RFC's range of light exertional activity.  (Tr. 30).

17

By contrast, the ALJ found the state agency medical consultants' findings of no severe physical impairments to be unpersuasive because their opinions "failed to adequately consider [Hambly's] subjective allegations and did not have the benefit of the entire record, which demonstrated he received recent physical therapy for his mild degenerative disc disease." (Tr. 30).  Finally, the ALJ addressed the opinion of Dr. Delcour and found it to be "generally persuasive," noting that Dr. Delcour had opined that Hambly "was capable of performing simple, routine tasks without fast pace and could have superficial, occasional interactions with the public."  (Tr. 30).

### C.    Past Work Determination

The ALJ determined that Hambly was capable of performing his past relevant work as a welding machine tender based on the VE's testimony that the demands of the welding machine tender as Hambly actually performed that job did not exceed the RFC posed by the ALJ for exertional and non-exertional work tasks.  (Tr. 30-31).  The ALJ also made an alternative determination that there were other jobs that existed in significant numbers in the national economy that Hambly could perform considering his age, education, work experience, and RFC (Cleaner Housekeeper, Marker, and Cafeteria Attendant), basing that decision on the VE's testimony.  (Tr. 30-32).

## V.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – 'such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones*, 336 F.3d at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support. *Rogers*, 486 F.3d at 241; *see also Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("It is not our role to try the case de novo."(quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely

overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio

Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn.

July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D.

Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a

reviewing court, will understand the ALJ's reasoning.

 At Step Four of the sequential evaluation process, the ALJ must determine a claimant's

RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e),

416.920(e).  The RFC is an assessment of a claimant's ability to do work despite her

impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R.

§ 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the

[ALJ] must consider limitations and restrictions imposed by all of an individual's impairments,

even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a

claimant's medical history, medical signs, and laboratory findings. 20 C.F.R. §§ 404.1529(a),

416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

 **B.** **Step Four – Mental Limitations in the RFC**

 With regard to the MRFC, Hambly essentially posits two arguments for reversal or

remand of the ALJ's determination: (i) the ALJ failed to discuss and compare Hambly's

educational records when discounting several expert opinions, as required by SSR 11-2p; and

(ii) the ALJ otherwise failed to properly evaluate the opinions of three medical experts – Dr.

Rivera, Ms. Johnson, and Dr. Delcour.  *See* ECF Doc. 9 at 14-24.  The Commissioner disagrees.

ECF Doc. 12 at 10-19.

 **1.** **Whether the ALJ Erred in Failing to Evaluate Educational Records
pursuant to SSR 11-2p**

 Hambly contends that the ALJ failed to properly consider Hambly's educational records

as required by Social Security Ruling ("SSR") 11-2p, 2011 SSR LEXIS 2 when assessing his

MRFC; and specifically, when the ALJ did not refer to or compare those records in determining the persuasiveness of medical opinions. ECF Doc. 9 at 22-24. The Commissioner disagrees, arguing that SSR 11-2p is inapplicable because it applies to young adults – defined as people between the age of 18 to approximately 25 – and Hambly turned 27 less than one month after the alleged onset date. ECF Doc. 12 at 18. The Commissioner also notes that the ALJ discussed the educational records in her written decision and argues that there is no remand-worthy error merely because the educational record is more robust than the ALJ's discussion of it. *Id.* at 18-19. Hambly replies that SSR 11-2p reasonably applied to him because he was 26 at the onset of his disability and the ALJ was still required to consider "other evidence" in the record at Step Four, but she failed to consider and evaluate the educational records. ECF Doc. 13 at 7-9.

SSR 11-2p provides guidance on how an ALJ should evaluate disability in young adults. SSR 11-2p, 2011 SSR LEXIS 2. The Ruling defines young adults as "people between the ages of 18 to approximately 25." *Id.* at *2. In relevant part, SSR 11-2p provides that a claimant's school records "may indicate how well a young adult can use his or her physical or mental abilities to perform work activities." *Id.* at *14. The Ruling instructs ALJs to take into account evidence from a variety of sources for the disability evaluation, including: (i) medical sources; (ii) school programs, including special education and IEP; (iii) psychosocial supports and highly structured or supportive settings; and (iv) extra help and accommodations. *Id.* at *9-20. SSRs do not have the force of law but are binding on ALJs. *See Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984); *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 272 n.1 (6th Cir. 2010) ("Social Security Rulings do not have the force and effect of law, but are 'binding on all components of the Social Security Administration' and represent 'precedent final opinions and orders and statements of policy and interpretations' adopted by the Commissioner." (quoting 20 C.F.R. § 402.35(b)(1))).

I find no error in the ALJ's treatment of the educational record in her decision.  Hambly was 26 years and 11 months old on the alleged disability onset date.  (Tr. 89, 195, 202).  He was nearly two years past the age of 25 on the onset date (and an ever-increasing gap thereafter); he cannot reasonably be considered to have been a young adult or person "between the ages of 18 to approximately 25" during the period under adjudication.  Thus, SSR 11-2p did not apply, and the ALJ was not required to consider or discuss Hambly's educational records.  SSR 11-2p, 2011 SSR LEXIS 2, at *2.  Furthermore, the ALJ was not otherwise required to discuss the educational records, as the Sixth Circuit does not require an ALJ to discuss every piece of evidence in the record.  *See Rottman v. Comm'r of Soc. Sec.*, 817 F. App'x 192, 194 (6th Cir. 2020) ("An ALJ need not discuss every piece of evidence in the record for the ALJ's decision to stand." (quoting *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) (alteration adopted)); *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2016).

To the extent that the ALJ was required to consider all relevant medical and other evidence in determining the MRFC, she sufficiently considered the educational records when she discussed them at Step Three, (Tr. 26), and otherwise stated that she considered the entire record at Step Four when determining the MRFC, (Tr. 27).  That the ALJ did not discuss the educational records in the detail as Hambly may have wished does not mean that the ALJ failed to properly consider them.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)).

## 2.     Consideration of Opinion Evidence

Hambly generally argues that the ALJ failed to apply proper legal standards in determining the mental limitations in the RFC, because her evaluations of Dr. Rivera's, Ms.

22

Johnson's, and Dr. Delcour's opinions were inadequate, given that she failed to sufficiently explain why additional limitations expressed by those providers were not adopted in the RFC. And he claims that her decision does not allow for meaningful judicial review.  ECF Doc. 9 at 15-22.

The ALJ was required to "articulate how [she] considered the medical opinions and prior administrative medical findings."  20 C.F.R. §§ 404.1520c(a); 416.920c(a).  An ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the claimant's] medical sources."  20 C.F.R. §§ 404.1520c(a); 416.920c(a).  Instead, when evaluating the persuasiveness of medical opinions and prior administrative findings, an ALJ must consider the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) "other factors," such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."  20 C.F.R. § 404.1520c(c).  At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors.  20 C.F.R. § 404.1520c(b)(2).

An error in an ALJ's evaluation of the opinion evidence may be harmless in one of three circumstances: (i) when the opinion was "so patently deficient that the Commissioner could not possibly credit it"; (ii) when the Commissioner made findings consistent with the opinion; or (iii) the Commissioner otherwise met the goals of the regulations by indirectly attacking the supportability or consistency of the opinion.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547

23

(6th Cir. 2004); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 440 (6th Cir. 2010).[1]

### a.    Dr. Rivera's Opinion

Hambly contends that Dr. Rivera's opinion indicated Hambly would have difficulties in multiple work-related areas and argues that the ALJ erred when she failed to adopt or otherwise modified these limitations without sufficient explanation. *Id.* at 16-18. Hambly argues that: (i) Dr. Rivera assessed limitations in the quality, not quantity, of Hambly's interactions with others; (ii) Dr. Rivera also found limitations in Hambly's ability to respond to work pressures; and (iii) the ALJ's failure to adopt these restrictions was harmful and required explanation. *Id.* at 18-19; *see* ECF Doc. 13 at 5.

The Commissioner responds that the conclusions in Dr. Rivera's opinion were expressed in vague terms, did not employ agency terminology, and described Hambly's functional capacity in terms of his self-reported difficulties – with Hambly's own counsel expressing confusion over the substance of Dr. Rivera's opinion. ECF Doc. 12 at 16. The Commissioner further argues that the ALJ: (i) found Dr. Rivera's opinion did not determine Hambly was precluded from performing work-related activity in any area; and (ii) was not required to include all of Dr. Rivera's limitations in the RFC. *Id.* at 16-17.

As noted by the ALJ, Dr. Rivera opined that Hambly would have "some difficulties in the work-related areas of completing tasks, relating to others, and managing work stress." (Tr. 29, 460-461). That said, Dr. Rivera's opinion lacked any specific functional limitations, certainly any that could be translated into an RFC. For instance, in the functional assessment section of

---

[1] While the harmless-error analysis articulated in *Wilson* concerned the pre-March 27, 2017 regulations, district courts within this circuit have applied that analysis to the post-March 27, 2017 regulations. *See Hickman v. Comm'r of Soc. Sec.*, No. 2:20-cv-6030, 2021 U.S. Dist. LEXIS 215187, at *14 n.5 (S.D. Ohio Nov. 8, 2021); *Vaughn v. Comm'r of Soc. Sec.*, No. 20-cv-1119, 2021 U.S. Dist. LEXIS 134907, at *33 n.8 (W.D. Tenn. July 20, 2021); *Burba Comm'r of Soc. Sec.*, No. 1:19-CV-905, 2020 U.S. Dist. LEXIS 179252, at *12 (N.D. Ohio Sept. 29, 2020).

Dr. Rivera's opinion, apart from stating Hambly's self-reported history, Dr. Rivera essentially opined the following: (i) during the assessment, Hambly sometimes processed information slowly and had some difficulty during the mental exam; and (ii) Hambly's learning difficulties, slow verbal-processing speed, and his attention difficulties *might* affect his ability to properly respond to supervision, coworkers, and work pressures. (Tr. 460-461). Such opinions lack the specificity required for the ALJ to determine an appropriate RFC based on "the most [the petitioner] can still do despite [the petitioner's] limitations." *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). Given the vagueness of the mental limitations set forth in Dr. Rivera's opinion, I can reasonably conclude that either: (i) the RFC sufficiently accounted for any limitation set forth by Dr. Rivera,[2] or (ii) it was not an error for the ALJ to not explicitly discount these vague limitations. *Cf. Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 434 (6th Cir. 2018) (providing that an ALJ may properly discount a vague opinion that does not provide any specific functional limitations and expresses functional limitations in vague terms); *see also Gaskin v. Comm'r of Soc. Sec.*, 280 F. App'x 472, 476 (6th Cir. 2008) (finding that an ALJ properly rejected portion of an opinion as vague).

I find no error in how the ALJ handled Dr. Rivera's vaguely stated functional limitations.

### b.    Ms. Johnson's Opinion

Hambly argues that the ALJ erred in discounting Ms. Johnson's opinion because the ALJ did not sufficiently discuss the supportability and consistency of her opinion. ECF Doc. 9 at 20-22. The Commissioner responds that there was no such error because: (i) when discounting the opinion, the ALJ noted that Ms. Johnson did not cite any record evidence for support and that it was inconsistent with contemporaneous treatment notes demonstrating Hambly's improvement

---

[2] Particularly because the RFC provided that Hambly be limited to unskilled work, no fast pace or high production quotas, occasional interaction with others, occasional superficial interaction with the general public, occasional change in the work setting, and low stress work. (Tr. 27).

on Lexapro; (ii) Ms. Johnson's checklist-style opinion has been characterized by courts as weak evidence; and (iii) Ms. Johnson found that Hambly had limitations that were far more restrictive than those in in all other medical opinions.  ECF Doc. 12 at 13-14 & n.5, 17-18.  Hambly replies that the ALJ erred because, when discounting Ms. Johnson's opinion, she failed to articulate evidence under the supportability and consistency factors.  ECF Doc. 13 at 5-7.  For the supportability factor, Hambly specifically argues that the ALJ was required to discuss Ms. Johnson's treatment notes.  *Id.* at 5-6.

First, contrary to Hambly's assertion, the regulations do not require the ALJ to explicitly discuss or analyze an expert's treatment notes when discussing the supportability of that expert's opinions.  Under the regulations, "supportability" means that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to his medical opinion, the more persuasive the medical opinion will be.  20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).  "In other words, the supportability analysis focuses on the physicians' explanations of the opinions."  *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 U.S. Dist. LEXIS 105354, at *4 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 U.S. Dist. LEXIS 61235, at *8 (E.D. Mich. Mar. 31, 2022)).  Moreover, the supportability factor "concerns an opinion's reference to diagnostic techniques, data collection, procedures/analysis, and other objective medical evidence."  *Reusel v. Comm'r of Soc. Sec.*, No. 5-20-cv-1291, 2021 U.S. Dist. LEXIS 81922, at *20 (N.D. Ohio Apr. 29, 2021).  The regulations specifically focus on the evidence and explanations supporting the expert's opinion, which are provided within that same medical opinion and/or come from that expert's own records.

By contrast, "consistency" requires the ALJ to consider "the evidence from other medical sources and nonmedical sources."  20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).  "Put simply, consistency is about how the medical opinion conflicts with evidence in the record, whereas

supportability is about how the medical opinion was soundly reached." *David C. v. Comm'r of Soc. Sec.*, No. 22-11292, 2023 U.S. Dist. LEXIS 199890, at *6 n.1 (E.D. Mich. Nov. 7, 2023) (citing SSR 96-2p, 1996 SSR LEXIS 9).  "As long as the ALJ discussed the supportability and consistency of the opinion and supported his conclusions with substantial evidence within his decision, the Court will not disturb his decision." *Njegovan v. Comm'r of Soc. Sec. Admin.*, No. 5:21-CV-00002-CEH, 2022 U.S. Dist. LEXIS 87318, at *13 (N.D. Ohio May 13, 2022).

I find that the ALJ adequately addressed the supportability and consistency factors in her discussion of the persuasiveness of Ms. Johnson's opinion. The ALJ explained that "[t]he available record showed that Ms. Johnson had only seen the claimant for two sessions in May 2021, and there is no indication she had [seen] him again prior to completing this form [on July 26, 2021, when] contemporaneous progress notes [from other providers] indicated his symptoms had already responded to Lexapro."  (Tr. 29-30).  That was a consistency finding.  And the ALJ then stated that Ms. Johnson's opinion was "not fully supported or consistent with the evidence." (Tr. 30).  In essence, the ALJ found that Ms. Johnson had little support for her opinions because she had only ever seen Hambly twice, was not engaged in ongoing treatment, and cited nothing to support her marked limitations.  That was a supportability finding.

An ALJ must provide analysis of the consistency and supportability factors sufficient to allow "a subsequent reviewer or a reviewing court to trace the path of [the ALJ's] reasoning." 82 Fed. Reg. 5844, 5858.  The ALJ's explanation allows us to track her reasoning and understand that she found Ms. Johnson's opinion inconsistent with the record evidence because contemporaneous treatment notes in the record undermined her findings for "marked" limitations.  (Tr. 29-30).  Substantial evidence bolsters this conclusion, including: (i) Hambly being prescribed Lexapro to manage his mood disorder in early April 2021, (Tr. 487); (ii) Hambly reporting that his anger and mood were improving while on Lexapro in late May

27

2021, (Tr. 492); (iii) CNP Giddens noting that Hambly's anger had improved, his mood was stable, and he was doing well on Lexapro, (Tr. 494); (iv) Hambly reporting to Ms. Johnson that he had started taking Lexapro and it was helping with his anger, anxiety, and moods, (Tr. 488, 501, 508); and (v) CNP Giddens stating in early October 2021 that Hambly had reported his mood was good and stable, and he was pleased with his current treatment plan, (Tr. 538).

Moreover, Ms. Johnson's opinion was a checklist/questionnaire form, which contained little more than the markings indicating her diagnoses and a statement that Hambly had "problems controlling emotions and behaviors, anger outbursts, and adult ADHD."  (Tr. 528). Courts within the Sixth Circuit have consistently determined that checklist opinions which lacked accompanying explanations, are unsupported, patently deficient, and a sufficient reason to discount a medical opinion.  *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 475 (6th Cir. 2016) (finding that checkbox or checklist evidence was "'weak evidence at best' and meets our patently deficient standard") (citations omitted)); *Marks v. Comm'r of Soc. Sec.*, No. 1:16-cv-02848, 2018 U.S. Dist. LEXIS 20220, at *23 & n.5 (N.D. Ohio Jan 12, 2018) ("Numerous decisions have found that the use of checklist or check-the-box forms in which the doctor provides little or no accompanying explanation for the assessed limitations . . . are unsupported and, therefore, the ALJ may properly discount the treating source opinions." (citing collected cases)); *Nolcox v. Berryhill*, No. 1:17-cv-02655, 2019 U.S. Dist. LEXIS 49412, at *24 n.5 (N.D. Ohio Mar. 25, 2019) (collecting cases).  In this instance, Ms. Johnson's lack of explanation for her findings rendered her opinion patently deficient.  *See Hernandez*, 644 F. App'x 468, 474-75 (6th Cir. 2016); *Burgess v. Comm'r of Soc. Sec.*, No. 19-13243, 2021 U.S. Dist. LEXIS 58803, at *15 (E.D. Mich. Mar. 29, 2021); (Tr. 297); *see also Fleming v. Comm'r of Soc. Sec.*, No. 4:10-CV-25, 2011 U.S. Dist. LEXIS 81040, at *28 (E.D. Tenn. July 5, 2011).  Thus, even if the ALJ had erred in analyzing the opinions of Ms. Johnson, such error was harmless given this

28

independent ground for rejecting those opinions.  *See Paradinovich v. Comm'r of Soc. Sec. Admin.*, No. 1:20-CV-1888, 2021 U.S. Dist. LEXIS 213589, at *24-25 (N.D. Ohio Sept. 28, 2021) (concluding similarly).

I find that the ALJ followed the proper procedures in discounting Ms. Johnson's opinion; and because that opinion could not possibly be credited, Hambly cannot establish reversible error.  *See Wilson*, 378 F.3d at 547.  Remand is not warranted on this basis.

### c.    Dr. Delcour's Opinion

Hambly argues that the ALJ did not properly evaluate Dr. Delcour's opinion because the ALJ failed to incorporate several limitations opined by Dr. Delcour into the RFC without providing an explanation.  ECF Doc. 9 at 19-20.  The Commissioner responds that the ALJ generally agreed with Dr. Delcour's opinion, she crafted mental limitations after reviewing the entire record, and she was not required to include all of Dr. Delcour's limitations in the RFC.  ECF Doc. 12 at 17.

The ALJ's analysis of Dr. Delcour's medical opinion stated:

> The undersigned is generally persuaded by the prior administrative medical findings of the State agency psychological consultant, who opined the claimant was capable of performing simple, routine tasks without fast pace and could have superficial, occasional interactions with the public.  ([Tr. 81-96]).  This opinion is generally consistent with the claimant's daily activities, including interacting appropriately with family members and medical providers, as well as his work history, which included performing unskilled and semiskilled tasks without problems remembering or understanding those simple, routine tasks.  The claimant has benefitted from routine, conservative treatment for his mental symptoms and has consistently reported relief of his anger outbursts since beginning medication.

(Tr. 30).

As noted by Hambly, the ALJ found Dr. Delcour's opinion to be generally persuasive, but she did not explain how or why she did not include several limitations opined by Dr. Delcour into her RFC findings.  ECF Doc. 9 at 19-20.  Notably, the ALJ omitted several limitations found in Dr. Delcour's opinion from the RFC, namely that: (i) Hambly should be "[l]imited to SRTs

that do not require extended period of attention and concentration"; (ii) Hambly "[s]hould avoid settings where close over the shoulder supervision is required [and] . . . . [i]s capable of an average level of supervision"; and (iii) Hambly was moderately limited in his "ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness." (Tr. 86-87, 94-95).  Upon review of the ALJ's discussion of Dr. Delcour's opinion, it is unclear whether the ALJ: (i) discounted these limitations, albeit without any explanation; or (ii) thought she had adopted limitations in the RFC that accommodated these "omitted" limitations.

The Commissioner is correct that an ALJ is not required to adopt a medical source's opined limitations verbatim in making RFC findings.  *Poe*, 342 F. App'x at 157; *see* SSR 96-5p, 1996 SSR LEXIS 2, at *13 ("Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the RFC assessment."); *see* ECF Doc. 12 at 17.  "Even [when] an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."  *Reeves v. Comm'r of Soc. Sec.*, 618 Fed. App'x 267, 275 (6th Cir. 2015); *see also Moore v. Comm'r of Soc. Sec.*, No. 1:13-CV-00395, 2013 U.S. Dist. LEXIS 170937, at *20-23 (N.D. Ohio Dec. 4, 2013) (finding that an ALJ who gave great weight to an opinion was not required to incorporate all limitations from that opinion).  However, the ALJ must still articulate how she considered prior administrative medical findings, 20 C.F.R. §§ 404.1520c(a); 416.920c(a), which includes explaining why the parts of an expert's opinion which conflict with her RFC findings were not adopted, *see Davis v. Comm'r of Soc. Sec.*, No. 5:20-cv-2807, 2021 U.S. Dist. LEXIS 244915, at *29 (N.D. Ohio Nov. 24, 2021) (citing SSR 96-8p, 1996 SSR LEXIS 5 at *7 (July 2, 1996).

Here, the ALJ determined that Hambly had the following limitations with regard to social

interactions: "[O]ccasional interaction with others; and occasional superficial interaction (meaning of a short duration for a specific purpose) with the general public[.]"  These limitations did not accommodate Dr. Delcour's opined limitation that Hambly should not be subjected to over the shoulder supervision.  (Tr. 86, 94).  Dr. Delcour's opinion provided a limitation to the type or quality of Hambly's interactions with supervisors (no over the shoulder supervision), while the RFC provided only a limitation in the frequency or quantity of Hambly's interaction with others ("occasional interaction with others").  "Courts have routinely recognized that limiting the quantity of time spent with an individual does not accommodate a limitation relating to the quality of the interactions - including a limitation to 'superficial' interaction."  *Hummel v. Comm'r of Soc. Sec.*, No. 2:18-CV-00028, 2020 U.S. Dist. LEXIS 267331, at *11 (S.D. Ohio Mar. 13, 2020) (collecting cases); *see Moon v. Comm'r of Soc. Sec.*, No. 3:20-CV-01773, 2021 U.S. Dist. LEXIS 231644, at *19-20 (N.D. Ohio Nov. 1, 2021) (explaining that occasional refers to the quantity of interactions, while "superficial" refers to the quality of interactions).  Because limitations based on quantity and quality of interactions are not interchangeable, when an ALJ replaces a limitation regarding "superficial interaction" with one regarding "occasional interaction" without any explanation, courts in the Sixth Circuit have routinely remanded.  *See Moon*, 2021 U.S. Dist. LEXIS 231644, at *20-21 (collecting cases).

Because the ALJ provided no explanation for why she omitted any limitations regarding the quality of Hambly's interactions with supervisors, remand is required.  *See Thomas C. v. Comm'r of the SSA*, No. 2:22-cv-3533, 2023 U.S. Dist. LEXIS 172833, at *11-14 (S.D. Ohio Sep. 26, 2023) (determining that remand was warranted because the ALJ found an expert opinion generally persuasive but failed to provide an adequate explanation as to why an opined limitation for no over the shoulder supervision was included in the RFC); *see also Gary L.L. v. Kijakazi*, No. 23-cv-17 (KMM/ECW), 2023 U.S. Dist. LEXIS 203727, at *17-19 (D. Minn. Oct. 11, 2023)

("[T]he fact that the ALJ did not include any restriction as to the quality of contact (superficial or some greater restriction) with Plaintiff's supervisors or co-workers, not just the duration of those contacts, remand is warranted to further address the evidence in the record as to this issue and clarify the RFC in this regard.").

There were other problems with the ALJ's handling of the Delcour opinions. Dr. Delcour opined that Hambly had moderate limitations in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. 94). But the ALJ's decision never mentioned this at all. (Tr. 30). And the ALJ did not discuss Dr. Delcour's opinion that Hambly had a moderate limitation in his ability to respond appropriately to criticism from supervisors. (Tr. 94). Because the ALJ never mentioned these limitations, we cannot determine whether or how the ALJ accounted for these limitations when formulating the RFC. Furthermore, it is unclear what portions of Dr. Delcour's opinion the ALJ adopted, and which portions she rejected. Accordingly, we cannot properly assess whether the RFC accounted for mental limitations found in Dr. Delcour's "generally persuasive" opinion.

It could well be that the ALJ had sound reasons for discounting those parts of the opinions of Dr. Delcour that did not find their way into the RFC or that the ALJ concluded that the RFC limitations adequately accounted for what Dr. Delcour opined. The essential problem is that we – and Hambly – are left to wonder. And that will not suffice. At a minimum, the ALJ failed to build a logical bridge between the evidence and the limitations adopted in the RFC, because we cannot trace the ALJ's reasoning in her assessment of Dr. Delcour's opinion.[3] *See Fleischer*, 774 F. Supp. 2d at 877; *Davis*, 2021 U.S. Dist. LEXIS 244915, at *29; 82 Fed. Reg. 5844, 5858.

---

[3] This cannot be considered a harmless error because the VE provided testimony indicating that trouble accepting direction from a supervisor and trouble maintaining socially acceptable levels of cleanliness and neatness would be work preclusive. (Tr. 60-61).

A.       **Step Four – Physical Limitations in the RFC**

    1.       **The Parties' Arguments**

Hambly contends that the ALJ relied upon her own unqualified lay opinion to formulate the physical limitations in the RFC, because she relied on updated treatment records that were never reviewed or interpreted by a medical expert.  ECF Doc. 9 at 24.  Hambly argues that the ALJ was required to obtain an opinion from a treating or examining source and therefore remand is required.  *Id.* at 24-25.  The Commissioner argues that the ALJ did not commit an error in formulating the physical RFC because: (i) she did not interpret raw medical data; (ii) the ALJ has discretion on whether to order additional consultative examinations; (iii) the record here was fully and fairly developed; and (iv) the ALJ provided sufficient explanation for adopting the physical limitations in the RFC, which also were supported by substantial evidence.  ECF Doc. 12 at 21-24.  Hambly replies that the ALJ found physical limitations in excess of the expert medical opinions on the record and she did not identify evidence in the record to support her findings.  ECF Doc. 13 at 9.

As discussed above, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 404.1520(e).  The RFC is an assessment of a claimant's ability to do work despite her impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

The RFC assessment requires an ALJ to walk a fine line.  An ALJ must perform her duty to evaluate the medical and other evidence while avoiding the temptation to "play doctor" by substituting her own medical judgment for that of medical professionals.  *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990); *accord Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006); *Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 823-24 (N.D. Ohio 2009) ("[A]n ALJ 'does not have the expertise to make medical judgments.'").  An ALJ might cross the line when she: (1) rejects a medical opinion without relying on other evidence or authority in the record; (2) interprets *raw medical data* (*e.g.*, uninterpreted x-rays and lab results); or (3) applies a sit-and-squirm test to assess a claimant's limitations based on observations at the hearing.  *See, e.g.*, *Weaver v. Sec'y of Health and Hum. Servs.*, 722 F.2d 310, 312 (6th Cir. 1983) (discrediting sit-and-squirm jurisprudence and requiring an ALJ to cite evidence beyond personal observations); *Harris v. Comm'r of Soc. Sec.*, No. 1:14-cv-1212, 2015 U.S. Dist. LEXIS 215464, at *50-53 (N.D. Ohio, Feb. 23, 2015) (collecting cases indicating that an ALJ needs a medical opinion to interpret "raw medical data"); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) ("[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other evidence or authority in the record.").

Nevertheless, the Sixth Circuit has "rejected the argument that an [RFC] determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ."  *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018).  The RFC determination "is an 'administrative finding,' and the final responsibility for determining an individual's RFC is reserved to the Commissioner."  *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442 (6th Cir. 2017).  And an ALJ does not err simply because her RFC finding is based on the objective medical evidence instead of a physician's opinion.  *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) ("[T]o require the ALJ to base [his]

RFC finding on a physician's opinion, would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled."(quotation marks omitted)).

The ALJ did not make an improper medical judgment regarding Hambly's physical impairments, but instead applied proper legal standards in evaluating Hambly's physical RFC. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ was *required* to consider all the objective medical evidence in determining: (i) whether the medical opinions of record were consistent with the record as a whole; and (ii) what Hambly's ultimate physical RFC was during the relevant period. 20 C.F.R. §§ 404.1520c, 404.1529(a); SSR 96-8p, 1996 SSR LEXIS 5.  And, in doing so, the ALJ did not cross the line into making her own medical judgments or "playing doctor." *Schmidt*, 914 F.2d at 118; *Meece*, 192 F. App'x at 465.  The ALJ did not interpret raw medical data, reject or partially adopt medical opinions without relying on medical evidence in the record, or apply an improper sit-and-squirm test.  *See generally* (Tr. 26-30).  Instead, the ALJ appropriately considered all of Hambly's symptoms as reflected in the objective medical and opinion evidence, discussed portions of the medical opinions in the record, and made an administrative finding of limitations based on that evidence.  *See* (Tr. 27-28, 30); *Mokbel-Aljahmi*, 732 F. App'x at 401; *Shepard*, 705 F. App'x at 442; *Rudd*, 531 F. App'x at 728.

For the physical RFC, the ALJ found that Hambly had the ability to perform work at the light exertional level with the following additional limitations: "Occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; can stand and walk 6 hours of an 8-hour workday; can sit for 6 hours of an 8-hour workday; unlimited push and pull other than shown for lift and/or carry[.]"  (Tr. 27).  In formulating the physical RFC, the ALJ considered Hambly's subjective symptom complaints and found that the medical evidence did not support Hambly's

asserted level of disability but did support a finding that he should be limited to a range of light exertional work. (Tr. 28) ("While these symptoms would reasonably limit his ability to perform strenuous or stressful work activity, the evidence fails to demonstrate the symptoms occur at a frequency or intensity that would interfere with work on a regular basis.").

The ALJ also evaluated the opinion of Dr. Gatton and found it generally persuasive to the extent that it was consistent with the RFC's range of light exertional work, noting that Hambly had participated in – apparently effective – physical therapy for back pain subsequent to Dr. Gatton's opinion. (Tr. 30) It is clear that the physical RFC is partially based on Dr. Gatton's opinion, as several physical limitations in both are nearly identical. *See* (Tr. 27, 30, 469). The ALJ also provided good reasons for declining to adopt the opinions of state agency medical consultants Dr. McKee and Dr. Teague, who found no severe medical impairments, stating that the opinions "failed to adequately consider the claimant's subjective allegations and did not have the benefit of the entire record, which demonstrated he received recent physical therapy for his mild degenerative disc disease." (Tr. 30).

Substantial evidence supports the ALJ's explanation for discounting the state agency medical consultants' opinions, with the record reflecting that, after the state agency consultants issued their opinions: (i) Dr. Viau assessed that Hambly's lower back pain was likely from a secondary degenerative disc, with X-ray results showing a mild degenerative disc disease, (Tr. 543-544); and (ii) Hambly attended nine physical therapy sessions for sprain and strain of his lumbosacral joint/ligament, (Tr. 551-596). Moreover, substantial evidence generally supports the physical limitations in the RFC. *See* (Tr. 387, 398, 469, 496-497, 514-516, 533-535, 540, 544, 542-543, 551-596); *Biestek*, 139 S. Ct. at 1154.

Hambly's arguments that the ALJ incorrectly interpreted raw medical data in the updated treatment records and that she was required to order additional opinion evidence lack merit. ECF

Doc. 9 at 24-25.  First, the updated treatment records were not "raw medical data" but consisted primarily of notes, assessments, and findings by medical professionals.  *See* (Tr. 530-599).  The ALJ referenced X-ray imaging that showed Hambly suffered from a mild degenerative disc disease, (Tr. 28), but even though the X-ray imaging itself is raw medical data, the ALJ referred to the doctor's interpretation of the X-ray imaging – which was not raw medical data.  *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 726-27 (6th Cir. 2013) (holding that an ALJ properly evaluated evidence of physical impairments without the assistance of a medical expert, when the ALJ considered X-ray imaging that he been read and interpreted by a radiologist); *Fowler v. Comm'r of Soc. Sec. Admin.*, No. 1:21-cv-01708, 2022 U.S. Dist. LEXIS 152820, at *39 (N.D. Ohio Aug. 9, 2022) ("[A]n ALJ does not 'interpret raw medical data' [when] X-rays or other records have already been interpreted by a treating physician or radiologist.").  The remainder of the evidence consisted of treatment notes that mainly involved medical professionals providing their observations and medical assessments, which are not raw medical data beyond the ALJ's expertise.  *See Winans v. Comm'r of Soc. Sec.*, No. 5:22-cv-01793, 2023 U.S. Dist. LEXIS 204232, at *11-12 (N.D. Ohio Nov. 15, 2023).

Second, the ALJ did not abuse her discretion in declining to order additional expert testing or testimony.  "An ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (citing 20 C.F.R. §§ 404.1517, 416.917); *see also Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination.").  As discussed above, there was evidence on the record concerning Hambly's physical impairments and abilities, and the updated treatment record was not beyond the ALJ's expertise and ability to

understand.  Thus, the ALJ was not required to procure additional opinion evidence and she did not abuse her discretion in declining to do so.  *See* 20 C.F.R. § 404.1519a; *Culp v. Comm'r of Soc. Sec.*, 529 F. App'x 750, 751 (6th Cir. 2013) (citing *Foster*, 279 F.3d at 355-56).

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence in evaluating Hambly's physical RFC, the ALJ's physical RFC finding fell within the Commissioner's "zone of choice" and cannot be second guessed by this court. *Mullen*, 800 F.2d at 545; *Rogers*, 486 F.3d at 241; *O'Brien*, 819 F. App'x at 416; *Jones*, 336 F.3d at 476-77; *Biestek*, 880 F.3d at 783.

## VI.    Conclusion and Recommendation

Even though the majority of Hambly's arguments concerning the propriety of the ALJ's decision lack merit, because the ALJ failed to follow the proper legal standards and failed to sufficiently articulate why she declined to incorporate certain limitations opined by Dr. Delcour at Step Four, I recommend that the ALJ's decision be remanded for further consideration on this specific issue.  I recommend that all other aspects of the ALJ's analysis be affirmed.

Dated: December 13, 2023

Thomas M. Parker
United States Magistrate Judge

---

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).